## UNITED STATES v. MINNEAPOLIS & ST. L. R. CO.

(District Court, S. D. Iowa, Central Division.   October 16, 1916.)

1. MASTER AND SERVANT ⬦⇒13—HOURS OF SERVICE ACT—VIOLATION.

Under Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913, §§ 8677–8680), limiting the hours of service of employés upon railroads to 16 hours per day, absolute releases of employés of freight trains for periods not exceeding 2⅓ hours occurring at meal times does not, where the employés were engaged for over 16 hours, operate to break the continuity of service and avoid the penalty for violation of the act, for the act should receive a liberal construction to give effect to its purpose, which was to promote the safety of employés and travelers by preventing railroad employés from continuing in service excessive periods, and railroad employés would hardly be likely to obtain much real rest or relaxation in so short a period, particularly as they were obliged to partake of their meals therein.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⬦⇒13.]

2. MASTER AND SERVANT ⬦⇒17—HOURS OF SERVICE ACT.

In such cases, where the railroad company had arranged the periods of rest for the purpose of complying with the law and was acting in good

faith, it should not be made to suffer a heavy penalty and a fine of only $100 for each violation will be imposed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. ☞17.]

At Law. Petition by the United States of America against the Minneapolis & St. Louis Railroad Company, charging a violation of the Hours of Service Act. Judgment for plaintiff.

The petition contains 19 counts, each count charging violation of the act of Congress "limiting the hours of service of employés" upon railroads, approved March 4, 1907.

Defendant filed answer, substantially admitting all of the facts alleged in each count of the petition, but pleading as to each count a certain period of "release" of each of the employés between the beginning of the service and the termination thereof; such period of release being, as to two counts, 2 hours and 20 minutes, and, as to the balance of the counts, 2 hours, and, because of such periods of release, the defendant denies liability.

### Finding of Facts.

The employés, who, it is charged in the 19 counts of petition, were required to serve for more than 16 hours each, consist of four groups, as follows:

(1) J. D. Haggin, engineer; H. C. Hoyer, fireman.

This engineer and fireman were operating an extra "helper" engine between Marshalltown and the town of Abbott. On December 10, 1914, the said engineer and fireman began service at 9:40 o'clock p. m., and continued service until 3:20 o'clock p. m., on December 11, 1914, a period which, if continuous, is 17 hours and 40 minutes. They returned from a trip to Abbott at 4:35 a. m., December 11th, at which time they got an absolute release from service until 6:55 o'clock a. m., a period of 2 hours and 20 minutes.

The engine was left at the water tank. The engineer went to the roundhouse, about a block away, and registered, and went from there to a restaurant and had breakfast, which took about 30 minutes, and then returned to the roundhouse, spending about 15 minutes upon his way visiting and talking, and then remained at the roundhouse until 6:55, the termination of the period of release, and then took charge of his engine. He lived in Marshalltown, some six blocks from where the engine was left, but did not go to his home because he did not want to awaken his wife. There were no facilities for rest in the roundhouse except some wooden benches, and he laid down upon one of those, and slept a little—half an hour or more. He did not remove his clothes, or retire for rest, except as aforesaid.

Hoyer, the fireman, left the engine at the same time as the engineer, but did not have to register, but went direct to the restaurant, which was about two blocks from the engine; had his breakfast. Had a regular place for sleeping about eight blocks from the yards, but he did not go there to sleep, and did not sleep at all. "Fooled around" until about starting time; played some pool at the restaurant.

The engineer and fireman both understood that they were fully released, and that the time was their own, and that they could do with it as they pleased.

(2) Group 2 consists of: J. P. Boyce, engineer; J. W. Gibson, engineer; B. McDonough, fireman; V. Miller, fireman; C. Van Draska, conductor; C. A. Benson, brakeman; M. C. Satchell, brakeman.

These men constituted a crew, operating a freight train with two engines, Grinnell to Oskaloosa, and return, and they entered service at 6:30 a. m., December 27, 1914, and terminated service at 11:45 p. m., on December 27th, 17 hours and 15 minutes after beginning service, with a period of release at Oskaloosa from 5 o'clock to 7 o'clock p. m., a period of 2 hours.

What this crew was doing during this period of time does not appear, except in so far as it may be inferred, because of the time of day, that they ate their supper.

(3) The third group consists of: J. T. Elder, engineer; E. L. Howell, fireman; S. S. Walton, conductor; W. H. Risney, brakeman; T. E. Young,

brakeman—composing a crew operating freight trains, Oskaloosa to Marshalltown, Iowa.' They entered upon service at 8:45 a. m., January 20, 1915, and continued service until 2 a. m. January 21st, a period of 17 hours and 15 minutes, with a period of release of 2 hours at Marshalltown, Iowa, from 3:35 p. m. to 5:35 p. m. on January 20th. The crew entered service at 8:45 a. m.; but waited until 9:40 before the train was ready to start. At Marshalltown, the engine was left at the roundhouse, about half a block from the depot. The engineer went to the roundhouse and reported, then went to a restaurant about two blocks away, and ate his supper, which took 20 or 25 minutes. There was no place specially provided for sleeping. There were some pillows and bedding in the caboose furnished by the brakemen and conductor for their own use, and they could sleep upon the cushioned seats extending lengthwise of the caboose, and this courtesy was extended to the fireman and engineer, if requested.

Howell, the fireman, left the engine the same time as the engineer, and went to the restaurant and had supper. Neither the fireman, nor engineer, had any home or place to sleep in Marshalltown, except as aforesaid, and except as the benches were present in the roundhouse.

Walton, the conductor, also went to the restaurant; had no place for sleeping in Marshalltown, except as aforesaid, and it does not appear that he slept any at that point.

What the brakemen did does not appear, except as it may be assumed that they also had supper.

(4) Group 4 consists of: B. F. Rinehart, engineer; W. S. Lewis, fireman; E. Hearne, conductor; A. C. Miller, brakeman; John Donner, brakeman— being a crew operating freight train, Oskaloosa to Marshalltown, Iowa. They entered service on January 28, 1915, at 6:15 p. m., and terminated service at 12:10 p. m. January 29th, being a total period of 17 hours and 55 minutes, with a 2-hour period of release from 4:50 a. m. to 6:50 a. m. on January 29th at Marshalltown, Iowa.

Rinehart lived at Oskaloosa; had no special place to sleep in Marshalltown; ate his breakfast three or four blocks from where he left his engine; there were places where workmen could sleep within a block or a block and a half of the yards at Marshalltown. The fireman had breakfast about the same time; did not go to sleep; no sleeping place in Marshalltown. There was bedding in the caboose, and Hearne, the conductor, went to the caboose and went to sleep for a while. The accommodations in the caboose were the cushioned seats, lengthwise of the car, about 2½ feet wide, and some 34 feet long; seats on both sides.

There is nothing definite as to what was done during the interval by Miller and Donner, the brakemen; but they had the privilege of sleeping there.

Claude R. Porter, U. S. Atty., of Centerville, Iowa.

Bowen & Alberson, of Des Moines, Iowa, for defendant.

WADE, District Judge (after stating the facts as above). The petition contains 19 counts, each count charging violation of the act of Congress "limiting the hours of service of employés" upon railroads, approved March 4, 1907.

There were four groups of employés, all in the freight service, on comparatively short runs, with the usual stops and delays for connections, and in all things practically typical of such service.

There is no question under the issues but that, as to each group, more than 16 hours' continuous service was required of the employés, unless in computing such service there be deducted certain periods of absolute release for a definite time.

Group 1 was in service from 9:40 p. m. December 10th to 3:20 p. m. December 11th, 17 hours and 40 minutes, with a period of absolute release of 2 hours and 20 minutes from 4:35 a. m. to 6:55 a. m.

Group 2 was in service from 6:30 a. m. December 27th until 11:45 p. m. December 27th, 17 hours and 15 minutes, with a period of absolute release from 5 to 7 o'clock p. m., a period of 2 hours.

Group 3 entered service on January 20th at 8:45 a. m. and continued until 2 o'clock a. m. January 21st, 17 hours and 15 minutes, with an absolute release of 2 hours from 3:35 p. m. to 5:35 p. m.

Group 4 entered upon service at 6:15 p. m. January 28th and terminated service at 12:10 p. m. January 29th, and were in continuous service for 17 hours and 55 minutes, except for an absolute release for 2 hours—4:50 a. m. to 6:50 a. m. January 29th.

[1] So that the real questions to be determined in this case are whether the periods of release aforesaid broke the continuity of the service so that the employés were not required to remain on duty "for a longer period than sixteen consecutive hours."

Evidence was introduced showing what certain of the employés did during the periods of release, and disclosing the opportunities, under the circumstances, for rest.

It will be observed that these periods of rest of 2 hours and 20 minutes in one case, and 2 hours in the others, occurred at a time when the men had to eat, and I think this fact has some bearing in the case. The circumstances and the conduct of the different employés appear to be fairly typical of the circumstances and conduct of railway employés generally who might be given a release at the times and places involved, or at similar times and places.

As to one group, the period of release was at Oskaloosa, one of the terminals of the service, and in the other three, at Marshalltown, one of the terminals in their service.

So that the question is fairly presented as to whether or not a period of release for 2 hours, or 2 hours and 20 minutes at a terminal, at meal time, is such a period as to break the continuity of service, and avoid the penalty for violation of the act.

After a careful study of all the cases, I am content to adopt the conclusion in Southern Pacific Co. v. United States (9th Cir.) 222 Fed. 46, 137 C. C. A. 584, which recognizes the rule that there may be "intermissions" of such period and under such circumstances as to break the continuity of the service. In this case it is held, and in my judgment properly held, that whether these intermissions are such as the law will recognize depends upon their character as periods of substantial rest.

It is also held:

"That the release of the employé must be definite and certain as to the period of time, and substantial and opportune as to the period of rest. A release for meals, or to stand and wait for another train, is not sufficient. There must be a substantial and opportune period; otherwise, the duty is a continuous one."

Taking into consideration the purpose of the law "to promote the safety of employés and travelers," were the periods of release in this case "periods of substantial rest"? Were they "substantial and opportune as to the period of rest"?

In view of the adjudicated cases, I confess that this is a close question. It must be conceded that the statute is entitled to a liberal con-

struction, with a view to effectuate the intention of Congress and promote the purpose which it had in view. The statute is still in the early stage of interpretation. In the present view of the courts, it is purely a question of fact as to whether a certain interval of time, during which an employé has an absolute release, is of such a character as to avoid the application of the rule.

Applying the test announced in Southern Pacific Co. v. United States, supra, it is my judgment that the periods of release were not such as to break the continuity, and that therefore, as to each and all of the employés, the service was continuous within the meaning of the statute.

I am not prepared to hold that an absolute release for a period of two hours at a time, other than at meal time, would not be such a period as might be considered "substantial and opportune" for rest. No arbitrary period can be fixed. The circumstances must determine. Sixteen hours' continuous service is a long service in such work. The employés in this case were out upon their trips 17 hours and 40 minutes, 17 hours and 15 minutes, 17 hours and 15 minutes, and 17 hours and 55 minutes, respectively; out of 24 hours, there was less than 7 hours left. The periods of release, in the very nature of things, could not be periods of "substantial rest." Rest is largely psychological. The circumstances must be such as to induce rest. The problem is not solved by saying that the men could have gone to bed and slept for an hour, or an hour and 20 minutes, aside from the time they were at their meals. We are dealing with human nature. The public is interested in actual rest, not in opportunities for rest; and, while I realize that the employer cannot be held responsible for failure of employés to rest when the opportunity is given them, yet I feel that the opportunity, to be "substantial and opportune," must be under such circumstances that the average employé will in fact rest.

The law contemplates results and effects. It seeks to keep the dangerous business of railroading in the hands of men who are not worn out by fatigue and loss of sleep. I can readily see where, if employés were given an absolute release for 2 hours, in the middle of the afternoon, or at 10 o'clock at night, that the tendency might be to immediately seek repose; while, on the other hand, it must be apparent that where, as illustrated in this case, the engineer has a release for 2 hours and 20 minutes, he leaves his engine, goes to the roundhouse and registers, walks two blocks to a restaurant, gets ready for breakfast, and has his breakfast, followed probably by a smoke, the circumstances and his natural feelings would not be such as to lead him to go and lie down to rest or to sleep. It is a time of more or less diversion, and the natural tendency would be to do, what most of these men did, "sit around" and talk and visit, and "kill time" until ready to start on the return trip.

An engineer must look over his engine; he must make his report; he must be back at his engine at a certain time. If he should go to sleep, he would have to be called at least 15 or 20 minutes before time in order to be ready. So that, when we consider all of these things, 2 hours, or 2 hours and 20 minutes, is a very short period.

It has been held, and I think properly held, that an hour at meal time does not break the continuity of the service. It has been held that three hours of absolute release would break the continuity of the service.

It is my holding that, when the release is at such time as that a meal is eaten during the period, under ordinary circumstances, 2 hours, or 2 hours and 20 minutes, is not a period of "substantial rest." It is not an "opportune period" for rest, and, this being my view, there will be a judgment against the defendant in this case upon the 19 counts.

[2] As to the amount of the judgment: It appears that the defendant has proceeded in the fixing of these periods of release with the purpose of complying with the law, and that it is in good faith in its claim that the periods of release exempts it from liability. I realize that the case is in a sense a "test case," and I do not believe that the defendant should be made to suffer a heavy penalty under the circumstances. I feel that the ends of justice will be subserved by imposing in this case a fine of $100 upon each count—a total of $1,900.

Counsel for defendant ask for a finding of facts. This I have made, and am filing herewith, together with the judgment herein.