## UNITED STATES v. DENVER & R. G. R. CO.

(District Court, D. New Mexico.   May 1, 1912.)

No. 126.

*(Syllabus by the Court.)*

1. RAILROADS (§ 230*)—OPERATION—SIXTEEN-HOUR LAW—"ON DUTY."

The expression "on duty," as used in the Hours of Service Law, otherwise known as the Sixteen-Hour Law, of March 4, 1907 (chapter 2939, 34 St. pp. 1415, 1416 [U. S. Comp. St. Supp. 1911, p. 1321]), means "to be actually engaged in work or to be charged with present responsibility for such should the occasion for it arise."

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 744; Dec. Dig. § 230.*]

2. RAILROADS (§ 230*)—OPERATION—SIXTEEN-HOUR LAW—"ON DUTY."

Where members of a train crew conforming to a rule of the railroad company report for duty 15 minutes before the starting time, during which time they are engaged in work preliminary to the trip, they are during such 15 minutes "on duty" within the meaning of section 2 of the Hours of Service Law (chapter 2939, 34 St. p. 1416 [U. S. Comp. St.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Supp. 1911, p. 1321]), and this notwithstanding their pay begins only upon the starting time.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 744; Dec. Dig. § 230.*]

**3. RAILROADS (§ 230*)—OPERATION—SIXTEEN-HOUR LAW—"ON DUTY."**

Where a train is held upon a siding at a station for 55 minutes to allow another train to pass, the exact time of arrival of the latter train being uncertain, and the duty existing upon the crew of the former train to resume the journey immediately upon such arrival, such crew is "on duty" during the period of waiting within the meaning of the Hours of Service Act, and such interval in the operation of the train does not constitute a break in "the sixteen consecutive hours" necessary to a violation of said act.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 744; Dec. Dig. § 230.*]

**4. RAILROADS (§ 230*)—OPERATION—SIXTEEN-HOUR LAW—"ON DUTY."**

The principle last stated is not interfered with by the fact that during such period of waiting the switch was locked, the headlight of the waiting train was extinguished, its conductor was reading, its brakemen were asleep.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 744; Dec. Dig. § 230.*]

Proceeding by the United States against the Denver & Rio Grande Railroad Company to recover penalties for violations of the Hours of Service Act. Judgment for plaintiff.

S. B. Davis, Jr., U. S. Atty., and Monroe C. List and P. J. Doherty, Sp. Asst. U. S. Attys.

E. N. Clark and A. C. Campbell, both of Denver, Colo., and Renehan & Wright, of Santa Fé, N. M., for defendant.

POPE, District Judge. This suit is brought by the government under section 2 of the Hours of Service Act of March 4, 1907 (34 Stat. 1415), which, so far as here material, reads as follows:

"Sec. 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this Act to require or permit any employé subject to this Act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employé of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required again to go on duty until he has had at least ten consecutive hours off duty."

The complaint is in four counts, the first three arising from the hours of service of the conductor and two brakemen of a freight train crew, and the fourth from the service of a telegraph operator. The liability of the company for the overservice of the last is not questioned on the argument. The controversy is as to whether the railroad is liable because of the hours of service of the train crew. The state of the record as to the controlling facts is fairly stated in the brief for the railroad as follows:

On November 10, 1910, the three members of the crew were called to take charge of a freight train leaving Alamosa, Colo., for Chama, N. M., at 4:20 p. m. There was a rule of the company requiring the train crews to report for service 30 minutes before leaving time, and,

pursuant to this, each person was at the point from which the train departed 15 minutes prior to 4:20 p. m., and thus at 4:05 p. m. The pay of the trainmen began, however, only at 4:20 p. m., the leaving time. The train actually left at 4:30 p. m. Between Alamosa and Chama the train was delayed at Osier station 55 minutes, awaiting the arrival of east-bound train No. 442. During this period it was on a side track with the headlight out and the switch locked. The brakemen spent a part of this waiting time asleep, the conductor in reading. They, however, were paid for this period the same as for actual running. The train arrived at Chama at 8:15 a. m., November 11, 1910, at which time the trainmen were relieved of all responsibility for the train.

It will thus be noted that this relief from duty occurred 15 hours and 45 minutes from the hour of leaving, and 16 hours and 10 minutes from the hour at which the crew reported for the trip. At 4:45 p. m. on November 11, 1910, and thus less than 10 hours—or, to be more exact, 8 hours and 30 minutes—from the expiration of the previous service the same crew was sent out on another trip. The suit is based upon the utilizing of the crew for further service when less than the 10 hours required by the statute above quoted had elapsed since a 16-hour service. The case turns, first, upon whether, in computing the 16-hour period, the preparatory service of 15 minutes is included; and, second, whether the 55-minute stop at Osier broke the continuity of the service, so that after all it did not include as much as "sixteen consecutive hours." In other words, the decisive question is whether the crew was "on duty" during both of these periods. It is doubtful if any definition of the words "on duty" can be clearer than the words themselves. Manifestly, however, they mean to be either actually engaged in work or to be charged with present responsibility for such should occasion for it arise. Tested by this definition, the crew during the preparatory 15 minutes was clearly on duty. They were at the starting point pursuant to a rule of the defendant company requiring them to be there. They were engaged in work necessary to the trip. The conductor, according to the proofs, was getting his bills and orders, the brakemen were looking over the train to detect defective cars and equipment and in going to the roundhouse to bring the engines and to couple them to the train. With all of these unperformed the train could not have moved. With some unperformed the train would probably have moved only to destruction for lack of orders or of safe equipment. These duties were quite as important as those after the train started, and, contrary to what counsel contend, impress us as constituting quite as great a strain upon the nervous and physical energies as arose after the train was actually in motion. We believe such to have been as much in the congressional mind in declaring what length of duty shall call for rest as those connected with a train actually moving. Nor does it detract from this view that the men were paid nothing for this preliminary work. The defendant can hardly be heard to contend this in the face of its rule requiring this very service. Presumably, however, in fixing a rate of compensation beginning in terms only with the starting time, the employés and the railroad took into consideration the rule just mentioned, so that

after all this preliminary work was not really done gratuitously, but was merged into a scale of wages mutually satisfactory to all concerned. At any rate, labor does not cease to be such because not paid for, nor does duty cease to exist because performed without compensation in connection with duty for which there was compensation.

But it is said by defendant that, however this may be, there was no consecutive service of 16 hours because of the lay-out of 55 minutes at Osier. This latter, as we have seen, was in order that eastbound train No. 442 might pass. The record shows that the hour of arrival of this latter was uncertain, except that it seems to have been momentarily expected. It might come in a few minutes, or it might not arrive in an hour. Pending its arrival, the train here involved was rendered safe by being put into a siding and the switch locked. As a matter presumably of economy the headlight was extinguished. All this done, the crew retired to the caboose, the brakemen to utilize the uncertain interval in a nap, the conductor in reading. There was, however, no release of the crew by the train dispatcher, and their pay covered the time they were held at Osier. It is said that, upon this state of facts, the crew ceased to be on duty during the wait upon the siding. This, however, is clearly untenable. True, as the conductor in effect testified, they ceased to be responsible during this period for the operation of the train, for it was not in motion. It is evident, however, that they became, instead, intrusted with its custody. It was further their duty to know immediately of the arrival of No. 442, whether this occurred in 10 minutes or in 55, and immediately upon such arrival they were charged with the responsibility of relighting the headlight, leaving the siding, and proceeding to destination. As long ago as Milton it was said: "They also serve who only stand and wait." It detracts nothing from this great truth as applied to the present situation that the tired crew at this hour of the night utilized the wait in sleep or in a book. They were there on pay; they were there in charge of the train; they were there subject to active duty as soon as No. 442 whistled for the station. Suppose that the latter train, instead of taking 55 minutes to arrive, had arrived in only 10. Would it be contended that such an interval would have broken the continuity of duty? And yet the principle in each case is precisely the same. We are of opinion that such a view of the statute as is here contended for by the defendant would ill accord with the purpose of the law as declared in its title, "to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon." A delay under the circumstances here disclosed constituted at most simply "a trivial interruption," such as under United States v. Atchison, T. & S. F. Ry. Co., 220 U. S. 37, 44, 31 Sup. Ct. 362, 363 (55 L. Ed. 361), "will not be considered." To hold otherwise will be practically to nullify the statute.

Viewing the matter in the light of authority, we are cited by defendant to no cases sustaining either of its contentions. On the contrary, very lucid expressions from Judge Morris in United States v. Illinois Cent. R. Co. (D. C.) 180 Fed. 630, sustained the view that the time occupied in the preliminary work is to be considered a part of the 16 hours allowed for service. Upon the question as to whether a

stop such as that at Osier broke the consecutiveness of the hours of duty, there have been convincing views that it did not expressed by Judge Trieber in United States v. Kansas City Southern Ry. Co. (D. C.) 189 Fed. 471, by Judge Maxey in United States v. St. Louis Southwestern Ry. Co. of Texas (D. C.) 189 Fed. 954, by Judge Foster in United States 'v. Galveston, Harrisburgh & San Antonio Ry. Co., decided in the District Court for the Western District of Texas at San Antonio without opinion, and by Judge Rudkin in United States v. Chicago, Milwaukee & Puget Sound Ry. Co., 197 Fed. 624 (recently decided in the District Court for the Eastern District of Washington).

It is accordingly found that the defendant is guilty upon each count. The excess over the legal hours of service by the train crew having been very small, the record suggests a lack of intent to violate the statute as to these. There will accordingly be a judgment for $50 against the defendant upon each of the first three counts. Upon the fourth, involving the telegraph operator, there will be a judgment for $100. The defendant will pay the costs.