**UNITED STATES of America**

v.

**The PENNSYLVANIA RAILROAD COMPANY.**

**Civ. A. No. 66-632.**

United States District Court
W. D. Pennsylvania.

Sept. 13, 1967.

W. W. Stanton, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Wallace D. Stewart, Pittsburgh, Pa., for defendant.

## OPINION

ROSENBERG, District Judge.

This action was brought by the United States of America under the Hours of Service Act (45 U.S.C. §§ 61–64) [1] against the defendant, The Pennsylvania Railroad Company, a common carrier engaged in interstate commerce. The complaint as filed by the Government charges the defendant with violation of the Hours of Service Act by requiring and permitting the five employees on Extra 2230 East to remain on duty "for a longer period than sixteen consecutive hours."

The parties hereto have filed an Agreed Statement of Facts. In this it is indicated that the defendant has admitted the allegations of the first five Causes of Action and set at issue Causes of Action Six through Ten, and the penalty amounts.

I find from the Agreed Statement of Facts that:

On January 30, 1966, there were nine inches of old snow on the ground in the vicinity of Conway, Pennsylvania, and that the area received an additional four inches of snow with considerable drifting with high winds;

The defendant had a yard at Conway and operations there were hampered due to the weather conditions;

Some of the trains were being held short of the yard;

The defendant operates trains from Mingo Junction, Ohio, to Conway, Pennsylvania, a distance of about forty-six miles;

On January 30, 1966, Conductor Hoffman, Flagman McDowell, Brakeman Chapman, Engineer Brandon and Fireman Tush went on duty at 5:30 A.M. at Mingo Junction as the crew of Extra 2230 East;

The train was delayed on account of engine trouble and about 10:00 A.M. the crew was required to exchange the engine at the engine house for another locomotive;

Eventually Extra 2230 East departed from Mingo Junction at 1:36 P.M. with 56 cars en route to Conway;

At about 3:15 P.M., Extra 2230 East arrived at Beaver, Pennsylvania;

Brakeman Chapman went to a nearby phone and asked the operator at Rochester when the train could be moved, and "The operator informed Brakeman Chapman that the crew was to relieve themselves of responsibility at the expiration of their 16 hours which were due to expire at 9:30 P.M. He also informed the crew that 'we will get you in as soon as possible with a relief crew.'";

The crew of Extra 2230 East did not move or protect the train after such instructions were received;

At 6:40 P.M., the crew on ED-29 went on duty at Conway and at 12:11 A.M., on January 31, they departed from Conway and arrived at the rear end of Extra 2230 East at 12:45 A.M.;

The rear-end crew on Extra 2230 East, Conductor Hoffman and Flagman McDowell, were relieved at this time and replaced by another conductor and flagman;

---

1. The pertinent part of § 62 reads as follows:

"It shall be unlawful for any common carrier, its officers, or agents, subject to sections 61–64 of this title to require or permit any employees subject to said section to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employee of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; * * *"

Crew ED-29 then moved to Rochester and crossed over to the other track so as to move to the head end of Extra 2230 East, where it arrived at 1:35 A.M.;

Brakeman Chapman, Engineer Brandon and Fireman Tush were relieved at the head end of Extra 2230 East and replaced by other employees;

There were on duty employees, as yard crew, from 3:00 P.M. until 11:00 P.M. on Engine 8604 at Conway, Pennsylvania, which crew could have been used to relieve the crew on Extra 2230 East on January 30, 1966;

But if this crew had been used, the defendant would have been required to pay this crew a penalty day of pay.

The defendant relies on the facts submitted here as showing relief from duty of the trainmen at 9:30 A.M. on January 30, 1966. The question then for determination is: As of what time were the crew members of Extra 2230 East legally relieved from duty? The parties agree that the crew's sixteen hours expired at 9:30 P.M. on January 30, 1966.

The plaintiff contends that Conductor Hoffman and Flagman McDowell were not *legally* relieved until 12:45 A.M. on January 31, 1966, and that Brakeman Chapman, Engineer Brandon and Fireman Tush were not *legally* relieved until 1:35 A.M. on January 31, 1966. The defendant contends that the crew was *legally* relieved at 9:30 P.M. on January 30, 1966. The word "legally" appears here as the bone of contention as it relates to the facts presented.

Were the crew members "relieved" at 9:30 P.M. when they were advised by the defendant's agent that they were to be relieved at the expiration of 16 hours' duty by the words "we will get you in as soon as possible with a relief crew"? Or, were they "relieved" at the early hours of January 31, when the relief crew arrived at the head and rear ends of Extra 2230 and took the men from the train and substituted a "relief" crew?

▇ The Hours of Service Act is remedial in nature and must be liberally construed. It was stated in Atchison T.

& S. F. Ry. Co. v. United States, 244 U.S. 336 (1916), at pages 342–343, 37 S.Ct. 635, 637:

"[I]t must be remembered that the purpose of the act was to prevent the dangers which must necessarily arise to the employee and to the public from continuing men in a dangerous and hazardous business for periods so long as to render them unfit to give that service which is essential to the protection of themselves and those intrusted to their care. * * * The act is remedial and in the public interest, and should be construed in the light of its humane purpose."

The defendant in its brief argues that since the crew of Extra 2230 East did not move or protect the train after 9:30 P.M. on January 30, 1966, the crew was not therefore required to perform any duties after the expiration of sixteen hours. It argues that "[i]n fact, the defendant took positive action to assure the non-performance of any duties by its crew." By this I presume that the defendant is referring to the operator's words at 3:15 P.M. that the crew was to relieve themselves of responsibility at the expiration of their 16 hours which was due to expire at 9:30 P.M., and that the words of the operator that "we will get you in as soon as possible with a relief crew" was not a direction or order for the crew to wait until the relief crew arrived.

The defendant contends "[t]he fact that defendant neither required nor permitted its crew to perform any duties after 16 hours and the fact that the crew did not perform any duties after that time should dispose of the case in favor of the defendant." The defendant further contends that it was hampered in its yard operations at Conway because of weather conditions and so was unable to get the train in as soon as possible with a relief crew.

Under these circumstances, the defendant contends, there was no inconsistency in the words of the operator nor any substance permitting the drawing of conclusions that the crew of Extra 2230

East was continued in employment after the sixteen hour period had ended. The men, they say, were free to leave at 9:30 P.M. on January 30, 1966. They remarked, however, that "[t]he night was wintry, windy and with perhaps a dozen inches of snow. Extra 2230 East was on an isolated stretch of track where it would be difficult for an automobile or taxicab to gain access. It would have been highly imprudent for the operator to have told the train crew to walk the several miles to Conway." It argues that under these circumstances it seems clear that the operator intended to convey that help was on the way.

It further argues that to the crew it seemed that the safest, most comfortable and most convenient procedure was to await the arrival of the relief train, and there was no hint of compulsion by the operator's words that additional duty beyond the sixteen hours was required, and that none was performed by the crew. It further adds that the crew was warm and comfortable in the caboose and locomotive and that it chose to await the relief train rather than risk the consequences of the inclement weather.

If the men were at liberty to go away and chose to remain voluntarily, then of course they had the right to do so, and this action would have to be dismissed. No facts are presented as relates to the rules requiring employees to stand by their equipment and under what circumstances.

■ There is no factual assertion that the men were or were not paid between 3:15 P.M. and 9:30 P.M. In fact, there is no assertion here that the men were paid from 9:30 P.M. until the time when they were replaced by other employees, both rear and front-end crews. We have the factual assertion that the men could not possibly leave the place of their employment because of their placement and weather conditions. As of 9:30 P.M., they were in a forced position and could not exercise their right to move freely from the train. They were placed in this position by both their employer and the inclement weather. However, it was within the power of the defendant to avail itself of Engine 8604 and its crew located at Conway and on duty there from 3:00 P.M. until 11:00 P.M. on January 30, 1966. Had it used this engine and crew it could have removed the restraint which it had imposed, together with the inclement weather, upon the members of the crew of Extra 2230 East. That it did not do so resulted in the involuntary attachment of the crew to the train where it had been placed by its employer. An employee who is waiting for a train to move and who is "not at liberty to go away" is on duty under the Hours of Service Act. "They were none the less on duty when inactive. Their duty was to stand and wait." Missouri, K. & T. Ry. Co. v. United States, 231 U.S. 112, 119, 34 S.Ct. 26, 27, 58 L.Ed. 144 (1913).

Mr. Justice McReynolds in Chicago & Alton Railroad Company v. United States, 247 U.S. 197, at pages 199–200 (1918), 38 S.Ct. 442, at page 443, 62 L.Ed. 1066, at pages 199–200 said:

"The purpose of the statute is to promote safety in operating trains by preventing the excessive mental and physical strain which usually results from remaining too long at an exacting task. * * * It must be construed and applied in view of that purpose and well-known circumstances attending the practical operation of trains."

The crew was under a long day of difficulties and hardships starting at 5:30 A.M. on January 30, 1966, at Mingo Junction, Ohio. They were delayed by engine trouble and required to change locomotives. When they did depart from Mingo Junction at 1:36 P.M. with 56 cars, they had just about spent a full day of labor. When they arrived at Beaver, Pennsylvania at 3:15 P.M., they called the operator for information on when the train could be moved. From 3:15 P.M. until 12:45 A.M. and 1:35 A.M., respectively, was another long drawn-out wait for the relief crew which had

been promised them by the operator's words "we will get you in as soon as possible with a relief crew."

■ To say that this crew was in a warm place in the caboose and engine and that they were comfortable and under no strain or stress would be stretching credence. From the facts as here presented, it is evident that the crew on Extra 2230 East, although inactive, was compelled to wait for the arrival of the relief crew. Until relieved of their responsibility, they were on duty.

In United States v. Detroit, Toledo and Ironton Railroad Co., 205 F.Supp. 860 (E.D.Mich.1962), at page 863, it was said:

"An employee is on duty under the Hours of Service Act when he is under orders and not at liberty to go away. He is none the less on duty even though inactive if the time is not his own. Missouri, Kansas & Texas Ry. Co. of Texas v. United States, 231 U.S. 112, 34 S.Ct. 26, 58 L.Ed. 144; United States v. Chicago, M. & P. S. Rd. Co., E. D. of Wash., 197 F. 624."

■ I find from all of the evidence as presented in the Agreed Statement of Facts that the defendant held five of its employees within its scope of authority and direction for more than sixteen hours and that it did so in violation of 45 U.S.C. § 62.

Section 63 of 45 U.S.C. provides that for violation of § 62 the defendant shall be liable to a penalty of not less than $200.00 or more than $500.00 for each and every violation to be recovered in a suit or suits to be brought by the United States Attorney in a district court having jurisdiction. This section further provides, *inter alia*, that the provisions contained in this section and other sections not here pertinent shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officers or agents and which could not have been foreseen.

■ Since there had been nine inches of old snow at the time the crew entered on duty at 5:30 A.M. on January 30, 1966, and since the time of year lent expectations that more snow could or would fall, and since it is common knowledge that conditions of snow drifts and wind in winter weather of this kind do interfere with traffic not only of railroad carriers, but of other kinds of automotive vehicular traffic, and so not such a set of circumstances as could be attributable to any case of casualty or unavoidable accident or the act of God, it cannot be said that the defendant may claim that it is not liable to a penalty for violation of § 62.

The fact is that at 1:36 P.M., when the train crew started from Mingo Junction, with 56 cars, the defendant knew that the crew had been on duty since 5:30 A.M., and nevertheless permitted it to start through the area which it knew had had heavy snow and wind drifts. But even after the crew had arrived at Beaver where it was held up and one of its number had called in for instructions at 3:15 P.M., it still had available during that afternoon a train and crew at Conway, a few miles away from Beaver, which train and crew could have gone to the aid of the train and crew of Extra 2230 East. Thus, the defendant may not be excused for violation of § 62.

■ However, from all of the circumstances as they appear here and because of the heavier burden placed upon the defendant because of the inclement weather conditions, it should not have imposed upon it the maximum penalty. Accordingly, judgment will be entered against the defendant as to Causes of Action 6, 7, 8, 9 and 10 of the complaint as filed by the Government in the amount of $250.00 as to each of the five Causes of Actions, in the total amount of $1250.00.

On Causes of Action 1 through 5, admitted by the defendant, judgment will be entered in the sum of $250.00 as to each Cause of Action, in the total amount of $1250.00, against the defendant and in favor of the plaintiff.

**350**

## ORDER

And now, to-wit, this 13th day of September 1967, it is hereby ordered that judgment be entered against the defendant, The Pennsylvania Railroad Company in the amount of two thousand five hundred ($2,500.00) dollars, and in favor of the plaintiff, United States of America.

